May I call the next case? 13-3740 Consolidated Rail Corporation v. United States Department of Labor, Mark Bailey Oral argument as follows, 15 minutes for the petitioner, 15 minutes to be shared by both the respondent and the intervener. Mr. Hawkins for the petitioner. Good morning, your honors, and may it please the court, my name is Robert Hawkins for Consolidated Rail Corporation and I've reserved three minutes for rebuttal. Please proceed. Thank you, your honor. This is a petition for review of a decision of the Administrative Review Board of the Department of Labor. The case arises under the Federal Railroad Safety Act. Conrail asks that the court grant its petition for review and direct that the complaint be dismissed. This case involves the application of the cat's paw theory of liability, but it does so in the context of an unusual disciplinary process where the decision maker is not the same person who witnesses the misconduct or even holds the disciplinary hearing and there's a full adversarial hearing before discipline is imposed. The ARB erred as a matter of law in its application of the cat's paw doctrine in this case. There are three critical facts that support that position. Number one, the decision to dismiss Mr. Bailey from employment was made by Conrail supervisor Joseph Price. There is no evidence, none, not even an allegation that Mr. Price harbored any retaliatory bias toward Mr. Bailey. Second, it is undisputed that the complainant in this case loudly challenged his supervisor, do you want to tangle with me, when the supervisor tried to talk to him. That conduct is admitted. It is admitted that Mr. Bailey said those words and he said them loud. Third, the administrative law judge found that Mr. Price based his decision solely on the fact that Mr. Bailey challenged his supervisor to tangle with him and not based upon whether Mr. Conley, who was the supervisor to whom those words were said, felt threatened. No party has challenged that finding by the administrative law judge. Under the cat's paw theory, an employer is not liable where an unbiased supervisor like Mr. Price makes his or her decision solely based on misconduct that is either admitted or proven by independent means. Even if you assume that there was substantial evidence and we vigorously dispute this. So you don't think we should be troubled at all by the fact that the evidence seems to suggest that the allegedly independent investigation at all? Mr. Price had the transcript and read the transcript of the investigation. In fact, that's what the ALJ relied on. If he'd read the transcript, he would have been able to answer the ALJ's questions about what was in the transcript, wouldn't he? Mr. Price answered the key questions about what was in the transcript. And that is, this was a straightforward case. This involved an oral confrontation between the supervisor and the employee. He was able to identify that the employee said those words. It was admitted. This was not a complicated case. It wasn't based on documents. And if you examine the record, Your Honor, as to the criticisms of what Mr. Price was or was not able to remember, the record does not support any sort of finding that Mr. Price didn't read the transcript or didn't understand it. For example, there was a question about when he made the decision. If you go back to the record citation for that, the testimony was Mr. Price said, I made the decision right after I read the transcript. The next question was, what was the date? He said, I don't remember. I don't remember the date I wrote the letter. They handed him the letter. He said, yep, that's the date. So if you go back to the criticisms against Mr. Price, they're not well founded. A simple example shows why Conrail's theory is correct in this case. Let's assume that a biased manager provides evidence that a railroad worker committed sabotage against safety equipment. But the railroad then holds a formal investigation the way you do in the traditional freight industry. Or as in this case, during that investigation, the railroad identifies independent evidence of the misconduct, like a videotape. Or assume that the worker admits what he did, like we have here. Under the cat's paw theory, the unbiased decision maker can rely on that evidence and make an unbiased decision. That's exactly what happened here. The formal investigation proved that Bailey challenged his supervisor to tangle with him. That's admitted. As Mr. Price testified in a real common sense way, it happened. The incident happened. It's not that hard a case as a disciplinary matter. When you say the incident happened, it does appear to me that you're right, that there's no dispute about those words being said. But at one moment, there's the allegation that he and Conley are face to face. And Conley says he's afraid that he's going to beat him up. And then you find that another version is they were at least 10 feet or more apart. And he says this when he's leaving out a different door. Nobody in the room that heard this attributed any significance to it at all. People have not been disciplined for saying or doing things more obnoxious than what this guy simply did. And then the most inexplicable thing to me at all is he says he's trembling, he's fearful he's going to get beaten up. But then he takes the guy by the arm and he takes him upstairs to see the supervisor. It just doesn't make sense. Your Honor, I asked a number of questions there. Let me see if I can get them all. There weren't questions. I was just suggesting to you that it's not quite as clear cut as you would like us to believe it is. Understood. But again, Mr. Conley is the gentleman to whom those words were said. In the testimony at the ALJ hearing and in the on-property investigation, he said nothing about being nose to nose. That testimony was from a third witness who reported a telephone call allegedly had between Mr. Conley and him. Where it mattered most, Conley was very clear. Conley admits that they were ten feet apart? They were approximately ten feet apart. And that people turned and walked out different doors after that? He went to the yardmaster's office. He got himself out of the situation. And the yardmaster sits in an adjacent office. It's a busy rail yard. He overhears all what Mr. Bailey said. And he said it was loud. The threatener also turns and the alleged threatener also turns and walks out. Is that not? I think he did at that point. But, Your Honor, he's already made that sort of a statement. Well, the statement. It seems to me that do you want to tangle with me is less of a threat than it would have been if he had said you don't want to tangle with me. With respect, Your Honor, Mr. Bailey is six foot four. He's a 300-pound weightlifter. Well, sure, but do you want to tangle with me can be answered by no, I don't want to tangle with you. Or it could be answered yes, I will tangle with you, and then you've got a real problem in the workplace. What significance is there, if any, that at least the argument can be made that Conley baited him into this? Your Honor, the suggestion of baiting is simply not supported by the record. As a supervisor, and this is critical in this case, in the railroad industry, the way railroads instruct people to avoid safety hazards, the way they keep people alive, is to go in and give a safety briefing. That's what Mr. Conley was trying to do that morning. At whatever time did Conley say, no, I'm not wanting to tangle with you. I'd like to give you a safety briefing. Will you sit down and listen? He didn't refer to a safety briefing at all. He just made a smart-ass comment about good morning, I guess not, and that's what precipitated this. But, Your Honor, the evidence is in the record that the intent of that morning was to give a safety briefing. How is Bailey supposed to know that? It was Bailey's outburst that stopped it. He said, good morning, don't talk to me. And then I could talk to you, do you want to tangle with me? You're missing a step. He says, good morning. Bailey keeps on going because apparently he doesn't want to talk to him, and everybody knew that, at which point Conley then says, I guess not. Or not. Or not. And that's what seemed to have precipitated the retort, is it not? No, Your Honor. That was part of the sequence. Conley talks to Bailey. He says, good morning. Bailey ignores him. He says, or not. And then Bailey and Conley have the discussion where he says, do you want to tangle with me? That's what happened. So you don't attribute the or not, you don't attribute any significance to the or not in terms of, correctly or incorrectly, making Bailey mad? Your Honor, for purposes of this case, you have Conley and you have Mr. McIntyre. They are the officers who were on the property at the time. They give evidence that Bailey said these words. They are said in the context of a disciplinary hearing where you have an investigation, you have an officer who holds the investigation, you have union representatives who question both witnesses, call witnesses of their own, and then you have a transcript that goes to someone as to whom there is no evidence of bias. He looks at the transcript and he says, unions made the provocation argument and so forth. This behavior has no place on the railroad. When you tell your supervisor, do you want to tangle with me? That's misconduct. And that is worthy of discipline. And that decision maker, there is absolutely no evidence of bias. Let me ask you this. Good morning or not, Bailey actually responds that he doesn't want to talk to him unless it's a work-related matter and turns and walks out. Conley then states in a louder tone, because Bailey had walked out of the room, that he could talk to him if he wanted. Your Honor, the sentence that Bailey claims to have said, I don't want to talk to you unless it's a business-related matter, that was a disputed issue of fact, and I don't believe the ALJ actually made a finding as to whether Bailey said that. I could be mistaken, but the bottom line here is the supervisor, who was charged with the response of I'm looking at a citation to the ALJ decision at 14, page 14 I guess that is, and then there's Conley then stated in a louder tone, because Bailey had walked out of the room, that he could talk to him if he wanted, ALJ decision at 14. Your Honor, that's what supervisors do. If an employee turns around and walks away from a supervisor, who is there to convey the message of a safety briefing, and the safety briefing here had to do with a fatality. I'm just pointing this out in terms of Judge McKeague's question about whether Conley seemed to have been baiting him. That, nah, nah, nah, nah, nah, I can talk to him if I want to, is just, it's prodding. But Your Honor, it is not okay for a railroad worker to tell a supervisor don't talk to me. That's just not okay. And if a supervisor persists in instructing his employee, that's what he's supposed to do. That's the way he gets information across. It's necessary. Bailey's not allowed to say don't talk to me any more than your law clerk could. Well, let's assume all of this is true. When I read this first, I thought, geez, it doesn't seem like that's the kind of conduct that should be permissible in the workplace by the employee. I agree with the point that you're making there. But then when you read the response, there is at least the suggestion that this is not necessarily a very nice and kind workplace in terms of the rough and tumble nature of the work, and that there have been lots of other incidences that did not create a discharge, people actually getting in fights and they didn't discharge that employee. So that then leaves you to wonder whether there was actually some animus as a part of this that led to discharging this guy based upon a statement if they don't discharge people for physical violence. Your Honor, I see my time is up, but maybe I can make two responses. Number one, there is no evidence that the relevant decision-maker, Mr. Price, ever treated anyone differently or better than Mr. Bailey. There's one decision-maker here. Number two, Mr. McBain is the source of most of the evidence that you just recited. McBain admitted that the workplace is a lot different than it was back in the day. This is before the workforce has changed dramatically and that the work rules and the work style has changed dramatically, and McBain admitted that. Good afternoon, Your Honors. Sarah Starrett for the Department of Labor. I'd just like to highlight a couple of points that were made by my esteemed colleague. On the question of whether Mr. Conley baited Mr. Bailey, I think that that's unquestionably true. The ALJ's findings of fact, to which this Court should defer, are pretty clear that they had had several discussions. They had had a discussion in January, about a month before all of this happened, in which Mr. Bailey had made a safety complaint and asked Mr. Conley, his supervisor, for a meeting, and during that meeting Mr. Conley said to him something along the lines of, if you're so unhappy here, why don't you quit? That was Mr. Bailey's testimony, and Mr. Conley said that what he said was, if you're so upset, why are you here? So essentially there were issues between the two of them. That was the time, according to the record, I believe, that Mr. Bailey said I really don't want to talk to Mr. Conley anymore because he felt that Mr. Conley was trying to get rid of him at that point, and that was in January, about a month before this happened. The other point that was left out, and I just want to make this clear on the record. But before we leave that, what sort of DOL standard is it that employees can simply announce I'm not talking to supervisors anymore? Is that really the government's position? Well, Your Honor, I would have to agree that these people were not warm and friendly to each other. There were certainly some issues of anger management. I think that Mr. Bailey was well known, at least to Mr. McIntyre, he had worked there for 12 years, was well known as a person who was not easy to get along with and who was somewhat difficult. I think what happened, though, again, going back a little bit, he had been there for 12 years and he had had a clean disciplinary record, so really there had not been any issues with him, I think, up to this point sometime in 2010, 2011. He testified when another co-worker got injured in a railroad FELA case, a liability issue for the railroad. And at that point he was told by the company's lawyers that no one had been filing written safety complaints, so there weren't any safety concerns. So he took it upon himself at that point, and this was in June, about six months prior to the suspension, he started filing written safety complaints and he filed about 35 written safety complaints to the headquarters in a space of about six months. Clearly McIntyre was unhappy and McIntyre, in fact, said to him, stop sending in those goddamn safety complaints. I mean, this is making everyone's life difficult because each of these complaints has to be responded to on paper and there's a file and the file is being developed. So McIntyre was very unhappy with Bailey, again, for a few months leading up to this point. So I think that both Connolly and McIntyre had had confrontations with Bailey in the previous months and during each of those confrontations, each of those people said to him, stop doing this, I don't want you to do that, why are you here, you're complaining all the time. And so Bailey was not happy. I think everyone agrees that the situation was a little bit tense between them, but on the other hand, there's no evidence that Bailey ever refused an assignment. He specifically said, and this is in the ALJ's decision, I believe at both page 14 and page 29, he specifically, she, the judge, the ALJ specifically finds that Bailey said, you know, don't talk to me except about work-related matters. And so if Connolly was actually there to give a safety briefing, which there's no evidence in the record, none whatsoever, that that's what was happening, I think Bailey, you know, was ready to listen. In fact, Bailey was getting ready for work. He walked into the lunchroom. When Connolly spoke to him, he walked away, literally walked away, walked into another room, made a phone call, got his assignment for the day, went back into the other room. All of this time, Connolly is talking to him, basically continuing to talk. So I think it's clear, as Your Honor has indicated, that Connolly was the one who instigated this confrontation. Connolly was the one who was deliberately baiting Bailey. The argument that there's this continuous discussion when they're going in and out of two rooms, unless I just missed that in the record, there's really only two things Connolly says, good morning or not. I think there may have been some additional words, but essentially it... And you say there's no evidence that he was there to do a safety briefing. That's what he testified, is it not? No, Your Honor. Again, I want to just be clear on this. Mr. Connolly testified in two different proceedings.  And he gave one statement about what happened, and then on cross-examination he gave some additional evidence. There was also a separate proceeding. Top of page 14. On February 11, 2011, Mr. Connolly said he went to the lunchroom to brief his crew on certain railroad risks and hazards following a recent fatality. Top of the page, ALJ's decision. Just give me a moment, I'm sorry. Yes, yes, and the complainant left the lunchroom, if you continue reading that paragraph. The complainant left the lunchroom. Mr. Connolly stayed where he was, and he continued to talk. He admitted that he never actually told the complainant why he wanted to talk to him. So it may have been in his mind that that was... My point is, you're making this harder than we need to make it. Sorry. Making an argument that's not supported by the record. I'm sorry, Your Honor. But I do believe that he admitted on transcript pages, and this is near the end of that paragraph, transcript pages 316, 471, and 495, Connolly admitted he never told the complainant why he wanted to talk to him. And, again, that's a key fact because I think that if Connolly had said that, we would have a completely different case. There would have been some different actions. I'd like to ask you to also look at the ALJ's decision at page 29 where she finds that Mr. Connolly's description of the incident lacks credibility, and Mr. Connolly attempted to exaggerate the events that occurred. So she just did not believe what Mr. Connolly said. She says he instigated the confrontation. She says she doesn't believe that he felt threatened. You know, there's a number of factors here that the judge relied on. She did not rely in any way, shape, or form on the arbitration proceeding, and we don't believe that that's even in the record before this court, so we ask that you not defer or take any notice of that other testimony because it's not before you. In this case, the ALJ found that McIntyre was not credible. She found that Connolly was not credible, and she found that Mr. Price, who was allegedly the ultimate supervisor who made this final decision to terminate Mr. Bailey, was also not credible. And I'd just like to make one other point about the cat's paw issue. The only involvement that Mr. Price had was after these events occurred. He was not an eyewitness. And, in fact, he testified that he didn't even read the eyewitness statement by Mr. Bain, which was in the record, which was an exhibit to the transcript that he said that he did read. Mr. Bain was there. He saw the whole thing, and he said that nothing unusual occurred. He also testified separately that other incidents had occurred that were much worse, where people actually had yelled and physically threatened each other and that no disciplinary action was taken. So Mr. Price's knowledge here, other than the fact that he was very close to Mr. McIntyre, they'd been friends for 20 years, he shared an office with Mr. McIntyre, Mr. McIntyre was his boss, all of which the judge found evidence that Price actually did know about these safety complaints. If, in fact, he read the transcript, which he said that he did, he would have known about the safety complaints. All of this, I think, is evidence that Mr. Price perhaps didn't have animus, but he certainly had knowledge. And I think it's pretty clear from the record that Mr. McIntyre and Mr. Connolly both had animus against Mr. Bailey, specifically because of his filing safety complaints. He was being a nuisance. He was being irritating. He was making their life difficult. So we actually don't endorse an employee refusing to talk to their supervisor, absolutely not. But we do believe that you have to show, and this is a case of first impression in this circuit, so this is going to be an issue that we want to get correct, you have to show that the protected activity in this case was a contributing factor in the suspension, in the decision to charge Mr. Connolly with a threat in violation of the workplace violence policy and in the ultimate termination decision. So we really have two or three different adverse actions. And Mr. Price, again, is a little bit separate because he was only involved in the final action, the termination. So even if you leave aside the cat's paw theory of who made these real decisions and why were these decisions made, under this statute, the protected activity has to only be a contributing factor, has to only be one of several reasons. Isn't there a real question here, Ms. Sarah, not whether the ALJ got it right or wrong, but whether there's substantial evidence that supports the ALJ? Absolutely, Your Honor. And I was actually very surprised that my colleague did not make that point because we believe that this entire case can be decided based on substantial evidence. It's a point that helped you, not him. Exactly. That's exactly right. You're the one that would make the argument. That's correct. The judge made findings of fact here. We think that those findings of fact are well supported. There was a hearing. There was cross-examination. There was eyewitness testimony. There was evidence in the record to support the findings that she made, which is that the company supervisors were not credible. The company supervisors did have knowledge of the safety complaints and that the safety complaints contributed. The other point that I would make is that under the Federal Railroad Safety Act, even if it's found that the safety complaints were a contributing factor to the suspension and or the termination, Conrail could have proven by clear and convincing evidence that they would have fired Mr. Bailey anyway. And the judge, I think, did an excellent job of going through the evidence of pretext. I don't know if you want me to go through that evidence again, but she found essentially that there were shifting explanations, that there was hostility, that there was animus, these people were irritated at him. They expressed their concerns about his safety complaints and asked him to stop filing the safety complaints. All of this happened before this alleged confrontation. She also found that they inconsistently applied their own policy. All right. Thank you, Counsel. Thank you, Your Honor. Good morning, Your Honors. Brian Ready for the intervener, Mark Bailey. Your Honors, the FRSA was enacted to encourage and implement safety on the railroad, in all areas of safety, whether it be railroad operations, railroad employees, and the public at large, anywhere that trains operate. The reason that this law came into effect is that before the amendments of 2007, the grievance procedure under the collective bargaining agreement was the procedure whereby if there was an employee concerned that he was being harassed for safety complaints, he could bring that. The FRSA, Congress enacted the amendments to say, no, we are delegating this authority to the Department of Labor. They're the ones that are going to investigate it, and they are the ones that are going to enforce it. And the framework then is the burden shifting that you apply in the FRSA, which is once the complainant shows that there was a contributing factor to the adverse action, a protected activity was a contributing factor, then it's the employer's burden to show by clear and convincing evidence that they would have taken the same adverse action absent any protected activity. You understand the concern that somebody might have about an employee claiming they're inoculating themselves by filing safety reports that then allows them to go on and violate the company's workplace violence policies. Absolutely, Your Honor, and with that, though, what I would say to that is You guys are not exactly a shining example here of the workplace safety enforcement team. Well, Your Honor, with respect to the safety enforcement team, I would beg to disagree with you on that. I would agree with you that he's not a, maybe in many circumstances, not the most civil individual, but the FRSA is not a civility code. It's about the law, and what we must remember is that the 35 safety complaints that the complainant filed were all found to be well-founded, and what happens, and the court has dealt with FELA actions in the past, what happens when someone is injured on the job, the first thing the railroad does is, well, you have to prove notice. We don't have any notice. There's no written safety complaints. That's why they don't want safety complaints. Those safety complaints are forms provided by the railroad. They're not something that Mr. Bailey just filled out on a piece of paper. It's a form that they provided. If they're not filled out, someone has an FELA action, what happens is the railroad comes in to a witness and says, Look, we have all these forms. You never filled one out. But when Mr. Bailey fills them out, then they go after him, and that's what they did here, Your Honor. The ALJ found that Conley instigated this. He did say to Mr. Unger, who the ALJ found to be a very credible witness, that Bailey got in his face and was nose-to-nose to him. Bailey was in the other room when he said to Conley, Do you want to tangle with me? The judge did not believe Conley, did not believe McIntyre. She believed that the filing of safety complaints and an on-duty injury that also happened in August of 2008, when Mr. Bailey reported that, McIntyre pulls him up to his office and says nothing about the on-duty injury, but says, You know, by the way, a month ago, a customer complained about you. That's what he does after he files an injury report? That's what the scenario is. The problem with this, the appellant's position, Your Honor, if their position is a loud stand, it eviscerates the protections of the FRSA. The FRSA purposely imposes a very strong burden on the railroad, the employer, to show by clear and convincing evidence that they would have taken this same adverse action anyway. And with respect to Your Honor's question about the positioning of people, Mr. Conley was in a room, Mr. Bailey was in the other room. There was a hallway where they could see each other when Mr. Bailey said, 20 feet away or so, Do you want to tangle with me? At that point, Conley, although he claimed that Bailey said it twice, no one else said Bailey said it twice, Do you want to tangle with me? No one else saw Bailey get closer to him and say it again. But at that point, Conley picks up a phone and starts walking towards Bailey to get out the door where Bailey is. Bailey comes into the room and is walking off to Conley's left. Someone that's really in fear for their life, and that's what Mr. Conley stated, I was in fear for my life, actually walks towards the person who supposedly threatens him. Conley continues to work for the rest of the day. This happened at 7.15 in the morning. Conley worked until 5 o'clock in the evening. He testified, and they're demonizing Bailey by trying to say, Look, we're all in fear of our life. There was a vicero, a witness that came in and said he's been in fear of his life by Mr. Bailey for the last 12 years. Yet he bet on football games with Bailey every week. It's an attempt to demonize Bailey, an attempt to send a message to all other workers who would be prompted to file legitimate safety complaints. If you do that, this is what is going to happen to you. My time is up, Your Honor. Thank you. Thank you. Rebuttal, Mr. Hawkins. Thank you, Your Honor. Your Honor, under the burden-shifting provisions of the FRSA, the complainant needs to prove that his protected conduct was a contributing factor here in Mr. Price's decision. Because if Mr. Price is admitted absolutely no bias whatsoever, he is an unbiased decision-maker. He makes his decision based upon objective conduct that is admitted. In preparation for our argument, I came across Your Honor's decision in Roberts v. Principe at 283 Fed Appendix 325, a remarkably similar case. What you have here is a classic example. Number one, there is no contributing factor toward Mr. Price's decision. He takes a cold transcript, never had met Bailey before, looks at what Bailey admits that he said, and says this conduct has no place on my railroad. Then you have the clear and convincing test. Did Conrail prove as a matter of law by clear and convincing evidence that it would have taken the same decision in the absence of bias? Well, in this case, you have a perfect laboratory conditions example. We don't have to guess what Mr. Price would have done. In a lot of contributing factor cases, you have to examine similar misbehavior and what the company did where you have admitted bias playing into the decision. Here, you have an unbiased decision maker who has given the transcript and he makes the call. You don't have to guess. What do we do about the ALJ's credibility findings? The ALJ's credibility findings run against McIntyre and Connelly as to their alleged bias. Now, we argue in the briefs the substantial evidence point. We urge you to read the briefs, but we can't possibly go through that all in our argument. But I would ask you to read the briefs on that subject. But as to Price. Let me just reassure you that we do read the briefs. I understand. I understand. As to Price, however, Your Honor, there is no allegation, no evidence, and no finding of bias. The only issue was whether he knew about the safety complaints and the ALJ said because McIntyre gave them the reports back to Bailey and that was in the transcript that he had, she then said, well, he probably did know. All right. Well, let's lay that point aside. Whether he knew or not doesn't matter. There's no evidence of bias. This man was in North Jersey for his whole career. He comes in about two months or three months after Bailey's taken out of service. He never met the man. Of course, the entire point of the cat's paw theory, whether you like it or not, is to, in a sense, infect the unbiased decision maker with the bias of the subordinate. And that's where the admission of Mr. Bailey that he said those words, that's where it comes in. The record is clear. He said those words and he said them loud. But that doesn't answer the question, it seems to me. If you frame the question to say would a truly unbiased decision maker actually have fired somebody for having said those words, that's the problem. That's price. That's price. And there's no evidence of bias. None. And by any measure, Your Honor, that was misconduct. An affirmance by We've got your argument. Thank you, Your Honor. Thank you. Case will be submitted.